## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-60396-CIV-ALTMAN/Hunt

**THE PROFESSIONAL AIRLINE
FLIGHT CONTROL ASSSOCIATION**,

     *Plaintiff,*

*v.*

**SPIRIT AIRLINES INC.**,

     *Defendant.*

_____/

### <u>ORDER</u>

This is a labor dispute under the Railway Labor Act. For years, Spirit's flight-dispatch officers worked out of a single control center in South Florida. Tired of weather disruptions and hurricane season, Spirit announced plans to open a second control center in Orlando. As a result of this announcement, Spirit and the dispatch-officers' union began negotiating—hoping to ameliorate the impact this new hub might have on Spirit's employees. When those negotiations failed, the union filed this lawsuit, in which it asks us to enjoin Spirit from going through with its plan. As we'll see, however, the Railway Labor Act channels "minor disputes"—like this one—out of federal court and into binding arbitration. Because we thus lack subject-matter jurisdiction over this case, we **GRANT** Spirit's motion to dismiss.

### THE FACTS

Spirit Airlines is a major U.S. commercial airline based in Miramar, Florida. *See* Am. Compl. [ECF No. 10] ¶¶ 2, 4, 6. Spirit employs about 75 flight-dispatch officers. *Id.* ¶ 6. Flight-dispatch officers are "highly trained individuals who exercise discretion over major flight decisions." *Id.* ¶ 5. Those decisions include things like flight paths, fuel loads, and crew composition. *Id.* The officers make these (complicated) decisions based on several variables—*e.g.*, aircraft specifications, weather conditions,

and airspace restrictions. *Id.* Once a flight departs, the flight-dispatch officer "share[s] equally" with the commanding pilot the "responsibility for the safety of each flight." *Id.*

Our Plaintiff, the Professional Airline Flight Control Association ("PAFCA"), serves as *both* the flight-dispatch officers' union *and* their exclusive bargaining representative. *Id.* ¶ 3. Spirit and PAFCA entered into a collective bargaining agreement on November 26, 2018. *Id.* ¶ 7. That agreement is effective from October 16, 2018, through October 15, 2023. *See* Collective Bargaining Agreement [ECF No. 10-1] (the "CBA") § 21. The CBA automatically renews "for yearly periods thereafter unless written notice of intended change is served in accordance with Section 6 . . . of the Railway Labor Act . . . by either party . . . not sooner than one hundred fifty (150) days prior to October 15, 2023." *Id.* In other words, the parties may serve a notice to amend—or otherwise renegotiate—the CBA *only* after May 2023. *Id.*

There are several CBA provisions that will become important to our overall story. For starters, the CBA contains a broad management-rights clause—which (among many other things) affords Spirit the discretion to transfer all (or part) of its operations. The clause provides: "Except as restricted by an express provision of this Agreement, the Company shall retain all rights to manage and operate its business and workforce, including but not limited to the right . . . to transfer operations or part of operations." *Id.* § 18A. The CBA also says that, "[w]here the Company opts to relocate the dispatch office to a new domicile more than fifty . . . miles from its current location, the parties will meet to discuss and agree upon moving expenses for affected employees." *Id.* § 6D. The parties agreed that "[a]ll orders . . . involving transfers [or] relocation . . . shall be in writing" and that Spirit would "provide an opportunity for [PAFCA] input regarding functionality and ergonomics . . . before the Company relocates the Dispatch Office." *Id.* §§ 20B, 20D.

For years, Spirit's flight-dispatch officers worked out of Spirit's control center in Miramar, Florida—where Spirit is headquartered. *See* Am. Compl. ¶¶ 2, 6. But the decision to employ only one control center—in a coastal city in South Florida—came with its own problems. *Id.* ¶ 9. In particular, Spirit was forced to evacuate the Miramar control center whenever it was threatened by hurricanes or other storms. *Id.* This disrupted Spirit's operations and required Spirit, anytime there was a storm, to transfer its operations temporarily from its headquarters. *Id.* Looking to avoid (or minimize) these disruptions in the future, Spirit informed PAFCA, in February 2020, that it planned to relocate the company's control center to Nashville, Tennessee—away from the coast. *Id.* After this announcement, Spirit and PAFCA began bargaining over employee moving expenses, in accordance with Section 6D of the CBA, *id.*, which (you'll recall) obliged the parties to "meet to discuss and agree upon moving expenses for affected employees," CBA § 6D.

Some months later, Spirit changed course. *See* Am. Compl. ¶ 12. In September 2020, Spirit announced that it wouldn't be relocating its dispatch center to Nashville after all. *Id.* Instead, it proposed *both* to keep the South Florida center *and* to open a second control center in Orlando. *Id.* Following this announcement, the parties restarted their negotiations. *Id.* ¶ 13. Unfortunately, these discussions were slightly more complex. *Id.* ¶ 14. While the original relocation plan had required the parties to bargain only over moving expenses, Spirit's proposed dual-control-center setup required the parties to discuss several other issues—including cross-center seniority rights, cross-center shift trading, and employee bidding (for work in one center versus the other). *Id.*

After some turbulent turns, the negotiations stalled. *Id.* ¶ 17. In late January 2021—four or so months after the parties started their negotiations on the dual-control centers—Spirit told PAFCA that it was done talking. *Id.* A week later, Spirit published a press release in an airline periodical, publicly

announcing its intention to open a second control center. *Id.* ¶ 18. In that publication, Spirit said that it would *either* transfer some employees from the Miramar location *or* hire new employees to work in Orlando. *Id.*

Frustrated, PAFCA sued Spirit in federal court, asserting three counts under the Railway Labor Act (the "RLA"): Count I alleges that Spirit violated 45 U.S.C. § 152 Seventh; Count II avers that Spirit violated 45 U.S.C. § 152 First; and Count III claims that Spirit violated 45 U.S.C. § 153. *See generally* Am. Compl. As redress, PAFCA asks us to enjoin Spirit from opening a second control center. *Id.* Spirit, in turn, filed a motion to dismiss under Rule 12(b)(1), contending that we lack subject-matter jurisdiction over PAFCA's claims because PAFCA's grievances constitute "minor disputes" under the RLA.[1] This Order follows.

## THE LAW

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "Since the courts of the United States are courts of limited jurisdiction, there is a presumption against its existence." *United States v. Rojas*, 429 F.3d 1317, 1320 (11th Cir. 2005) (cleaned up); *see also Bors v. Preston*, 111 U.S. 252, 255 (1884) (Harlan, J.) ("[T]he courts of the Union, being courts of limited jurisdiction, the presumption, in every stage of the cause, is that [they are] without their jurisdiction, unless the contrary appears from the record."). "A defendant can move to dismiss a complaint under Rule 12(b)(1) for lack of subject matter jurisdiction by either facial or factual attack." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). In our case,

---

[1] The Motion is fully briefed. *See* MTD [ECF No. 12]; MTD Response [ECF No. 21]; MTD Reply [ECF No. 27].

Spirit has launched both a facial *and* a factual attack. Because we think that jurisdiction is plainly absent on the face of the complaint, we stop there—addressing only the facial challenge.[2]

In a facial attack, "the plaintiff is left with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised." *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (cleaned up). That means we look to the complaint "and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Id.* (cleaned up). In doing so, "the allegations in [the] complaint are [generally] taken as true for the purposes of the motion." *Stalley*, 524 F.3d at 1232–33 (cleaned up). At the same time, "[o]ur duty to accept the facts in the complaint as true does not require us to ignore specific factual details of the pleading in favor of general or conclusory allegations." *Flylux, LLC v. Aerovias de Mex., S.A. de C.V.*, 618 F. App'x 574, 577 (11th Cir. 2015) (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205–06 (11th Cir. 2007)). "Indeed, when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Id.* (quoting *Griffin Indus.*, 496 F.3d at 1205–06).[3]

---

[2] It's sufficient for us to find that PAFCA's claim fails on the facial challenge. *See, e.g.*, *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) ("The district court has the power to dismiss for lack of subject matter jurisdiction on any of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; *or* (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." (emphasis added & cleaned up)); *Lewis v. Knutson*, 699 F.2d 230, 237 (5th Cir. 1983) ("[T]he jurisdictional basis must survive both facial and factual attacks before the district court can address the merits of the claim."). We'd note, though, that we've reviewed the parties' evidence and that we'd reach the same result on Spirit's *factual* challenge.

[3] PAFCA argues that a motion to dismiss under 12(b)(1) should be granted "only if it appears certain that the Plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." MTD Response at 2 (citing *Stranser v. Strange*, 100 F. Supp. 3d 1276, 1279 (S.D. Ala. 2015)). This standard, of course, harkens back to the old days of *Conley v. Gibson*, under which "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46 (2007). We very much doubt that this test applies today. For one thing, the Supreme

**ANALYSIS**

### A.  This Case Presents a Minor Dispute

"Concerned that labor disputes would lead to strikes bringing railroads to a halt, Congress enacted the [RLA] in 1926 to promote peaceful and efficient resolution of those disputes." *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs*, 558 U.S. 67, 72 (2009). The RLA "was extended in 1936 to cover the airline industry." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248 (1994). The RLA "groups disputes into two categories, major and minor." *Empresa Ecuatoriana De Aviacion, S.A. v. Dist. Lodge No. 100*, 690 F.2d 838, 842 (11th Cir. 1982). As we'll see, "[w]hether the court has jurisdiction to resolve the underlying contractual dispute depends on whether it is 'major' or 'minor.'" *Bhd. of Locomotive Eng'rs v. Union Pac. R.R. Co.*, 879 F.3d 754, 757 (7th Cir. 2017).

So, to start, major disputes concern "rates of pay, rules, or working conditions." 45 U.S.C. § 151a. In other words, they are "disputes over the formation of collective agreements or efforts to . . . change the terms of one." *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945). "In the event of a major dispute, the RLA requires the parties to undergo a lengthy process of bargaining and mediation." *Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 299, 302 (1989) ("*Conrail*"). This process begins

---

Court has abandoned *Conley* on 12(b)(6) motions for failure to state a claim. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (requiring "enough facts to state a claim to relief that is plausible on its face"). Unsurprisingly, the Alabama case PAFCA cites relied on a pre-*Twombly* decision. *See Strawser*, 100 F. Supp. 3d at 1280 (citing *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)). The Eleventh Circuit has also told us that, under 12(b)(1), "the plaintiff is left with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss . . . is raised." *McElmurray*, 501 F.3d at 1251 (cleaned up). Viewed in this context, PAFCA's argument seems illogical. Why would a plaintiff be required to do *more* to state a claim than he would have to do to invoke our constitutionally limited subject-matter jurisdiction? *Cf. Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924–25 (11th Cir. 2020) ("[I]t's long been known that even at the pleading stage, the litigant must clearly and specifically set forth facts to satisfy the requirements of Article III." (cleaned up)). But, even if PAFCA is right about the "no set of facts" standard, PAFCA's claim to jurisdiction is not just implausible; it's also *impossible* in light of the CBA's plain language.

6

when either side serves (on the other) a Section 6 "notice of an intended change." 45 U.S.C. § 156. At that point, "[u]ntil they have exhausted [the RLA's] procedures, the parties are obligated to maintain the status quo, and the employer may not implement the contested change in rates of pay, rules, or working conditions." *Conrail*, 491 U.S. at 302–03. "The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures[.]" *Id.*

By contrast, minor disputes—instead of flowing from the creation or amendment of an agreement—are "disputes growing . . . out of the *interpretation or application* of agreements covering rates of pay, rules, or working conditions." 45 U.S.C. § 151a (emphasis added); *see also Burley*, 325 U.S. at 723 (explaining that a minor dispute "relates either to the meaning or proper application of a particular provision"). A minor dispute is "subject to a less onerous process of arbitration." *Hawaiian Airlines*, 512 U.S. at 265. So, "[i]n the airline industry," for instance, "a minor dispute is resolved by an adjustment board established by the airline and the unions." *Conrail*, 491 U.S. at 304 n.4. In a minor dispute, the parties aren't required to maintain the status quo: "[E]ach is free to act under its interpretation of the collective bargaining agreement until the arbitrator rules otherwise." *Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc.*, 869 F.2d 1518, 1520 (D.C. Cir. 1989). In general, "[e]xclusive jurisdiction over minor disputes rests with the system adjustment board." *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1308 (11th Cir. 2001).

In short, whether we have subject-matter jurisdiction over this case hinges (for the most part) on whether our dispute is major or minor. *See, e.g.*, *Conrail*, 491 U.S. at 304 (noting that "any adjustment board under the RLA" has "exclusive jurisdiction over minor disputes"); *Int'l Bhd. of Teamsters v. Amerijet Int'l, Inc.*, 604 F. App'x 841, 848 (11th Cir. 2015) ("[A]s a jurisdictional matter, the RLA prohibits federal courts from reaching the merits of minor disputes."); *Stewart v. Spirit Airlines, Inc.*, 503

F. App'x 814, 817 (11th Cir. 2013) ("Under the RLA, federal courts lack subject matter jurisdiction over [minor] disputes[.]"); *Pyles v. United Air Lines, Inc.*, 79 F.3d 1046, 1050 (11th Cir. 1996) ("Congress intended that these 'minor disputes' be resolved through the grievance procedures of the RLA rather than in federal court."); *Empresa*, 690 F.2d at 844 ("A minor dispute must be submitted to compulsory arbitration by an adjustment board, which has exclusive jurisdiction to decide minor disputes.").

But how do we find the hazy border between major and minor disputes? As a "shorthand method," the Supreme Court has told us (as we've hinted) that "major disputes seek to *create* contractual rights, minor disputes to *enforce* them." *Conrail*, 491 U.S. at 302 (emphasis added). The Court has also clarified that "the formal demarcation between major and minor disputes does not turn on a case-by-case determination of the importance of the issue presented or the likelihood that it would prompt the exercise of economic self-help." *Id.* at 305. Instead, the canonical test is this:

> Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.

*Id.* at 307. In drawing this line, "the threshold to bind the parties to the exclusive arbitral jurisdiction accompanying a minor dispute is a low one." *CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1321 (11th Cir. 2003) (cleaned up). In fact, the Eleventh Circuit has said that, where any "reasonable doubt exists as to whether the dispute is major or minor, we will deem it to be minor." *Id.* (cleaned up). Placing a thumb on the scale in this way makes sense: "Since the machinery for resolving major disputes is conciliatory rather than binding, a major dispute can escalate into a strike, which in the transportation industries—producers of a nonstorable service—can be a calamity. So it is no surprise that, when in doubt, the courts construe disputes as minor." *Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe Ry. Co.*, 768 F.2d 914, 920 (7th Cir. 1985) (Posner, J.).

Spirit easily meets *Conrail*'s "arguably justified" standard. Indeed, the CBA has a *sweeping* management-rights clause that expressly says: "Except as restricted by an express provision" in the CBA, Spirit "retain[s] all rights to manage and operate its business and workforce." CBA § 18A. It seems fair to conclude that Spirit's right to "manage and operate its business and workforce" includes *both* the right to expand its facilities *and* the right to determine where its employees should work. And, fortunately, we don't need to guess at this inference because, in setting out a non-exhaustive roster of "retained" rights, the CBA explicitly lists—in no uncertain terms—Spirit's right to "*transfer operations or part of operations*." *Id.* (emphasis added). This provision is, standing alone, probably enough for Spirit to satisfy *Conrail*'s relatively low bar. *See Conrail*, 491 U.S. at 307 (emphasizing the "relatively light burden which the [airline] must bear in establishing exclusive arbitral jurisdiction under the RLA" (cleaned up)).

But there's (much) more. Other provisions of the CBA likewise appear to recognize Spirit's right to transfer its operations. So, for example, one section (on moving expenses) provides that, "[w]here the Company *opts* to relocate the dispatch office to a new domicile . . . , the parties will meet to discuss and agree upon moving expenses for *affected* employees." CBA § 6D (emphases added). The use of the word "opts" in this context supports Spirit's position that the CBA makes it Spirit's decision—and Spirit's decision alone—to relocate its operations. And, while the provision talks of *relocating* the dispatch office, nothing in the CBA generally (or this provision specifically) suggests that Spirit cannot relocate only *part* of its operations, as it has proposed to do here. Indeed, the provision's requirement that the parties discuss moving expenses *only* for "affected employees" arguably implies that the CBA allows Spirit to relocate some (read: *affected*), but not all (*unaffected*), of its operations and employees. The CBA also says that "orders" involving "transfers" or "relocation" must be in

9

writing—suggesting (it would seem) that Spirit has the *authority* to order its employees to relocate. *Id.* § 20D.

But here's the thing: PAFCA may well be right that *none* of these provisions—individually or together—permit Spirit to unilaterally open a second control center. PAFCA's problem, however, is that it's simply *not our role* to "consider the merits of the underlying dispute"—to determine, in other words, whether the CBA does (or does not) allow Spirit to transfer part of its operations to Orlando. *Gen. Comm. of Adjustment, United Transp. Union, W. Md. Ry. Co. v. CSX R.R. Corp.*, 893 F.2d 584, 592 (3d Cir. 1990) (cleaned up). It's enough for our purposes that Spirit's decision is "*arguably justified*" by the text of the CBA. In other words, it's sufficient for Spirit to show (as it has) that this case stems from a dispute—*not* over the creation of a new agreement or *even* over an amendment to the old one (indeed, the CBA cannot be amended until May 2023)—but over the enforcement of an agreement that's already been signed. *Conrail*, 491 U.S. at 307; *see also Stewart*, 503 F. App'x at 820 ("[I]f a reasonable doubt exists as to whether the dispute is major or minor, we will deem it to be minor."); *Maine Cent. R.R. Co. v. United Transp. Union*, 787 F.2d 780, 782 (1st Cir. 1986) (noting that "it is not for [the court] to weigh, and decide who has the better of the argument," and adding that, "[i]f the court did this, it [would] overstep[] its bounds and usurp[] the arbitrator's function").

In similar circumstances, federal courts across the country have agreed that an airline's attempt to relocate its operations constitutes a minor dispute. Take the Second Circuit's decision in *Association of Flight Attendants v. United Airlines, Inc.*, 976 F.2d 102 (2d Cir. 1992), for example. In that case, United Airlines decided to open and staff a new domicile in Paris for 195 flight attendants. *Id.* at 103. The fight-attendants' union sued under the RLA, challenging United's decision. *Id.* at 104. Reversing the district court, the Second Circuit concluded that the case presented a minor dispute. *Id.* In doing so,

the Second Circuit explained that United had only the "relatively light burden" to show that its "action [was] arguably justified by the terms of the parties' collective-bargaining agreement." *Id.* at 105. And the court found that the agreement "arguably entitled [United] to establish new domiciles in foreign countries" because "the agreement [was] at best ambiguous." *Id.* In fact, there was "no provision" at all "limiting the establishment of new domiciles." *Id.* Our case, of course, is even stronger—because our CBA has much more than mere silence: It's replete, as we've seen, with *express textual support* for Spirit's position. As in *United Airlines*, then, this dispute belongs in arbitration.

And, for this proposition, authority abounds. *See, e.g., Div. No. 1, Bhd. of Locomotive Eng'rs v. Consol. Rail Corp.*, 844 F.2d 1218, 1219, 1224 (6th Cir. 1988) (concluding that the railway's "unilateral decision" to change the location "where the road engineers must report for work each day" was "arguably justified" and thus presented a "minor dispute"); *Hilbert v. Pa. R.R. Co.*, 290 F.2d 881, 882 (7th Cir. 1961) (holding that "a reassignment of engineers from defendant's terminal at Terre Haute, Indiana, to defendant's terminal at Indianapolis, Indiana," involved "a conflict over the interpretation or application of the provisions of the existing contract" and thus presented a "minor dispute"); *Norfolk & Portsmouth Belt Line R.R. Co. v. Bhd. of R. R. Trainmen, Lodge No. 514*, 248 F.2d 34, 36, 42–43 (4th Cir. 1957) (concluding that a railway's decision to "establish[] a new point at which five of the carrier's thirty-four train crews would be required to report for duty . . . arose out of a difference of opinion as to the interpretation or application of the existing agreements" and thus presented a "minor dispute").

Against all this, PAFCA advances three arguments—all unconvincing.

*First*, PAFCA tries to analogize our case to the Supreme Court's decisions in *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union*, 396 U.S. 142 (1969), and *Order of Railroad Telegraphers*

*v. Chicago & Northwestern Railway Co.*, 362 U.S. 330, 331 (1960). But those cases are completely irrelevant here. While both discuss what should happen *in the event* of a major dispute, neither helps us answer the threshold question we face today: What constitutes a major dispute in the first instance?

Let's start with *Shore Line*. A railway advised its workers' union that it intended to establish a new outpost, requiring "many employees to report for work at Trenton rather than Lang Yard where they had been reporting." *Shore Line*, 396 U.S. at 144. In response, the union (*unlike* our case) "fil[ed] a notice under § 6 of the Railway Labor Act proposing an *amendment* to the collective bargaining agreement to cover the changed working conditions of the employees who would work out of Trenton." *Id.* at 144 (emphasis added). No one disputed that this notice triggered the RLA's "major dispute" provisions, covering "those disputes involving the formation of collective agreements and efforts to change them." *Id.* at 148. The only issue before the Court appears in the first sentence of its opinion: "This case raises a question concerning the extent to which the [RLA] imposes an obligation upon the parties to a railroad labor dispute to maintain the status quo while the purposely long and drawn out procedures of the Act are exhausted." *Id.* at 143. In other words, the question in *Shore Line* was whether a carrier must "preserve the status quo in only those working conditions covered in the parties' existing collective agreement" or whether (instead) the "status quo extends to those actual, objective working conditions" that prevailed before the dispute. *Id.* at 153–54. In answering this question (about the *scope* of the status-quo requirement), the Court opted for the latter view, holding that it was "incumbent upon the railroad by virtue of § 6 to refrain from" changing *actual* working conditions—in that case, the outpost location—"regardless of the fact that the railroad was not precluded from making these assignments under the existing agreement." *Id.*

12

In our case, though, we don't *get* to the big question the Court addressed in *Shore Line*—the scope of any status-quo injunction—because (contra *Shore Line*) we have no Section 6 proposal to amend the CBA. Since our case presents only a *minor* dispute, *Shore Line* does not govern our outcome.

As it turns out, federal courts have universally rebuffed parties' efforts to contort *Shore Line*'s reasoning in the way PAFCA does here. In the Sixth Circuit's words: "[The Union's] reliance on [*Shore Line*] is misplaced because the issue of characterizing a labor dispute as major or minor was not before the Court. The decision dealt instead with the RLA's status quo requirement as applied to what all agreed was a major dispute." *United Transp. Union v. River Terminal Ry. Co.*, 142 F.3d 438, 438 (6th Cir. 1998) (cleaned up); *see also Ass'n of Flight Attendants v. Mesa Air Grp., Inc.*, 567 F.3d 1043, 1049 (9th Cir. 2009) ("Before a federal court can even reach the analysis in *Shore Line*—that is, before a court can decide whether something is an established practice protected by the status quo—it must find that the disagreement in the case is a major dispute."); *Bhd. Ry. Carmen of U.S. & Can., Div. of Transp. Commc'ns Union v. Mo. Pac. R.R. Co.*, 944 F.2d 1422, 1427 n.5 (8th Cir. 1991) ("*Shore Line* is not applicable to the facts of this case, however, as . . . the possibility of a minor dispute was not addressed.").

In invoking *Telegraphers*, PAFCA again misses the point. *See* MTD Response at 7–13. In *Telegraphers*, the railroad proposed to "abolish[]" certain stations, which would "necessarily result in loss of jobs for some of the station agents and telegraphers." *Telegraphers*, 362 U.S. at 332. As in *Shore Line*, the union "notified the railroad under § 6 of the [RLA] that it wanted to negotiate with the railroad to amend the current bargaining agreement." *Id.* In particular, the union sought to *add* the following rule to the agreement: "No position in existence on December 3, 1957, will be abolished or discontinued except by agreement between the carrier and the organization." *Id.* The Court concluded that it was "impossible to classify [this] as a minor dispute"—in part because (unlike our case) "[p]lainly

13

the controversy [in the case] relate[d] to an effort on the part of the union to *change* the 'terms' of an existing collective bargaining agreement." *Id.* at 336, 341 (emphasis added).[4]

The crux of the case, though, was actually—at least in our view—a different issue: the railroad's position that the union's Section 6 written proposal to freeze all terminations "did not constitute a labor dispute under the Railway Labor Act" and "did not raise a bargainable issue." *Id.* at 332 (cleaned up). In other words, although both major *and* minor disputes concern changes in "rates of pay, rules, or working conditions," *see* 45 U.S.C. § 151a, the railroad was suggesting that the decision to close facilities and implement layoffs was not any of these things—and so, was not "bargainable" under the RLA, *Telegraphers*, 362 U.S. at 334. The Court rejected this position—rejected, in other words, the railway's view that "the union's effort to negotiate about the job security of its members represents an attempt to usurp legitimate managerial prerogative in the exercise of business judgment with respect to the most economical and efficient conduct of its operations." *Id.* at 336 (cleaned up). The railroad's decision, in short, was not a unique management prerogative that fell beyond the RLA's detailed system of alternative dispute resolution. *Cf. Chicago & Nw. Transp. Co. v. Ry. Lab. Execs.' Ass'n*, 908 F.2d 144, 152 (7th Cir. 1990) ("A matter of prerogative is one the carrier is not required to bargain over[.]" (citing *Telegraphers*, 362 U.S. at 337–40)).

---

[4] The analysis in *Telegraphers* wasn't entirely clear. At one point, it suggested that "it is impossible to classify as a minor dispute this dispute relating to a major change, affecting jobs, in an existing collective bargaining agreement, rather than to mere infractions or interpretations of the provisions of that agreement." *Telegraphers*, 362 U.S. at 341. In saying so, it appeared to suggest that the major-minor distinction hinged on the *magnitude* of the action—*viz.*, its practical consequences. But the Supreme Court has explicitly rejected this view, saying: "[T]he formal demarcation between major and minor disputes does *not* turn on a case-by-case determination of the importance of the issue presented or the likelihood that it would prompt the exercise of economic self-help." *Conrail*, 491 U.S. at 305 (emphasis added).

Like *Shore Line*, *Telegraphers* has very little to do with our case. Why? Because, while the union in *Telegraphers* sought to "change" its collective bargaining agreement, neither party has proposed any such amendment here. Indeed, as we've said, no such amendment would even be permissible under the CBA until May 2023. *See* CBA § 21. Instead, under *Conrail*, Spirit has proffered an "arguably justified" reading of its *existing* CBA—and so, the parties' disagreement is a minor dispute. Nor does *Telegraphers'* discussion of the management-prerogatives doctrine alter our result. Spirit, after all, has *never* contended that its decision to open a new control center is somehow immune from the strictures of the RLA—whether because of management prerogatives or anything else. To the contrary, Spirit's position in this case has always been that the parties' dispute should be submitted to arbitration *in accordance with the RLA*. So, whether its decision to open dual control centers is a matter of managerial prerogative (or not) is kind of beside the point. *See Rutland Ry. Corp. v. Bhd. of Locomotive Eng'rs*, 307 F.2d 21, 36 (2d Cir. 1962) ("We do not say that the issue in the present case is not a bargainable one. We have no doubt that the [union], upon the expiration of the existing agreements, may require the railroad to bargain[.]").

*Second*, PAFCA contends that "[t]he Management Rights provision contained in Section 18 of the Agreement does not arguably justify Defendant's unilateral action in this case." MTD Response at 13. For this view, PAFCA focuses on two words in Section 18A of the CBA—"[e]xcept" and "retain." Here's the provision in full: "*Except* as restricted by an express provision of this Agreement, the Company shall *retain* all rights to manage and operate its business and workforce, including but not limited to the right . . . to transfer operations or part of operations." CBA § 18A (emphasis added). Neither word helps PAFCA's case.

15

Starting with the "except" clause, PAFCA argues that Section 16 of the CBA—which creates a hurricane response team—curtails Spirit's right to transfer *part* of its operations to Orlando. *See* MTD Response at 15 ("To the extent that the parties have already expressly provided for hurricane response working conditions in the Agreement, Section 18, on its face, does not apply to permit Defendant to change those working conditions."). We disagree. While Section 16 kicks into gear whenever Spirit feels it's "warranted" to "operat[e] the [control center] *temporarily* from an alternate location," CBA § 16, that section never sets out any *permanent* solution for solving weather disruptions. In fact, the section says *nothing at all* about a permanent relocation. Nor does the CBA *ever* hold up Section 16 as the exclusive method for keeping operations up and running in the event of a storm. In short, *nothing* in Section 16 expressly bars Spirit's proposal.

As for its "retain" argument, PAFCA claims that *Shore Line* and *Telegraphers* stand for the proposition that "no inherent management prerogative exists to change work assignments." MTD Response at 14. If this is true (PAFCA insists), then Spirit could have "retain[ed]" no such prerogative under Section 18A. *Id.* Here, PAFCA just misconstrues these decisions. In *Shore Line*, remember, the Supreme Court simply held that, *in a major dispute*, a carrier had a duty to maintain the status quo— and, it added, the status quo included those actual, objective practices that fall *beyond* the terms of the collective bargaining agreement. *Telegraphers*, on the other hand, *did* suggest that a railroad had no "managerial prerogative" that would place its decision to cut operations beyond the reach of RLA's alternative-dispute-resolution process. But that's not to say that a carrier—like Spirit—retains *no right* to relocate its operations; it's just to say that, *when there's a major dispute*, its decision to relocate must be stalled (and bargained over) as part of the status quo.

In other words, PAFCA conflates two distinct concepts. The first is the concept of management prerogatives—such as selling or closing a business. These are the kinds of core entrepreneurial decisions an employer is never required to bargain over. *See Pittsburgh & Lake Erie R.R. Co. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 490, 509 (1989) ("[T]he decision of a railroad employer to go out of business and consequently to reduce to zero the number of available jobs is not a change in the conditions of employment forbidden by the status quo provision of § 156."). As Judge Posner explained:

> A union cannot freeze the status quo by demanding negotiations over something that the carrier is entitled to do unilaterally either because the collective bargaining agreement authorizes the carrier to do it or because it is within the carrier's "management prerogatives," the class of decisions that are not decisions about rates of pay, rules, or working conditions and so are outside the scope of the status quo provision altogether.

*Chicago & Nw. Transp.*, 908 F.2d at 151.

The second concept has to do with retained rights, which remain within management's discretion *unless* the collective bargaining agreement restricts them. Courts have widely held that, because a collective bargaining agreement "cannot expressly regulate every conceivable employment matter," those agreements "need not include provisions permitting management action on every conceivable employment matter; rather, on issues not discussed in the Agreement, management retains discretion." *Airline Pros. Ass'n, Teamster Loc. Union 1224 v. ABX Air, Inc.*, 400 F.3d 411, 415–16 (6th Cir. 2005) (cleaned up). In the Supreme Court's words:

> Collective bargaining agreements regulate or restrict the exercise of management functions; they do not oust management from the performance of them. Management hires and fires, pays and promotes, supervises and plans. All these are part of its function, and absent a collective bargaining agreement, it may be exercised freely except as limited by public law and by the willingness of employees to work under the particular, unilaterally imposed conditions.

*United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 583 (1960). All of this is to say that, since the CBA doesn't appear to prohibit Spirit from transferring part of its operations—and, in fact, because it arguably authorizes as much—Spirit "retain[ed]" its discretion to relocate part of its operations to Orlando.

One more thing on this argument. We generally "interpret collective-bargaining agreements . . . according to ordinary principles of contract law[.]" *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). This means that, "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Id.* (quoting 11 R. LORD, WILLISTON ON CONTRACTS § 30:6 (4th ed. 2012)); *see also Savage Servs. Corp. v. United States*, 25 F.4th 925, 941 (11th Cir. 2022) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." (quoting A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56 (2012)). And "retain" means to "to keep in custody or under control" or "[t]o continue to have or possess." *Retain*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/164150?rskey=leRmYi&result=2#eid (last visited Mar. 25, 2022). To *continue* to control or possess something presupposes that the subject *already* had the thing. The word's ordinary meaning, then, suggests what the caselaw has already told us—that Spirit *had* the right "to transfer operations or part of operations" and that it "continue[s] to have" that right. The plain text of the CBA, in short, supports Spirit here.

*Third*, PAFCA contends that the CBA's moving-expenses provision undermines Spirit's position. That provision reads: "Where the Company opts to relocate the dispatch office to a new domicile more than fifty (50) AAA miles away from its current location, the parties will meet to discuss and agree upon moving expenses for affected employees." CBA § 6D. PAFCA argues that Spirit is

not "relocating" the dispatch office because that office is staying right where it is. That's certainly one way to read this provision. Indeed, it may even be the most plausible reading. Still, we can't say that Spirit's reading—that it *is* relocating because it's moving a *part* of its dispatch office to Orlando—is "frivolous or obviously insubstantial." *Conrail*, 491 U.S. at 307. And, for all the reasons we've thus far highlighted, Spirit's construction gains steam when we consider it—as we must—in light of the agreement as a whole. *See Caron v. NCL (Bahamas), Ltd.*, 910 F.3d 1359, 1367 (11th Cir. 2018) ("[O]ur duty is to interpret the contract as a whole, not each term in a vacuum."). PAFCA's argument only highlights, in other words, that this case presents a minor dispute—a reasonable disagreement over the *interpretation* of the CBA—that must be resolved by the adjustment board, not a federal judge.

*     *     *

Because the case presents only a minor dispute, we lack subject-matter jurisdiction to adjudicate it.[5]

---

[5]     This suffices to dismiss Counts I and II of PAFCA's complaint. In Count I, PAFCA seeks injunctive relief under 45 U.S.C. § 152 Seventh, which says:

> No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

The RLA's text—in governing only "changes" to "rates of pay, rules, or working conditions"—is explicitly limited to major disputes. Because this is a minor dispute, we have no subject-matter jurisdiction. *Empresa*, 690 F.2d at 844 ("A minor dispute must be submitted to compulsory arbitration by an adjustment board, which has exclusive jurisdiction to decide minor disputes.").

In Count II, PAFCA seeks injunctive relief under 45 U.S.C. § 152 First of the RLA, which provides:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to

19

### B.  The Narrow Minor-Dispute Exception Does Not Apply

In general, as we've said, "[t]here is no statutory requirement that while a minor dispute is being arbitrated the status quo must be maintained; the carrier may act unilaterally until told to do otherwise by the adjustment board's decision." *Empresa*, 690 F.2d at 844. In fact, we (for the most part) "lack subject matter jurisdiction over [minor] disputes." *Stewart*, 503 F. App'x at 817. The Supreme Court has suggested, though, that federal courts *do* have "the power to impose conditions requiring maintenance of the status quo" in a minor dispute when doing so "would operate to preserve [the adjustment board's] jurisdiction by preventing injury so irreparable that a decision of the Board in the union's favor would be but an empty victory." *Bhd. of Locomotive Eng'rs v. Missouri-Kansas-Texas R.R. Co.*, 363 U.S. 528, 534 (1960). In the Fifth Circuit's words:

> [T]he proper grounds for granting an injunction against action that is the subject matter of a minor dispute under the RLA are extremely narrow. Such injunctions may issue only where necessary to preserve the jurisdiction of the grievance procedure, or where a disruption of the status quo would result in irreparable injury of such magnitude that it would render any subsequent decision meaningless.

*Int'l Bhd. of Teamsters Loc. 19 v. Sw. Airlines Co.*, 875 F.2d 1129, 1136 (5th Cir. 1989) (cleaned up). For three reasons, this "extremely narrow" exception doesn't apply here.

---

the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

The Eleventh Circuit has held that federal courts lack subject-matter jurisdiction over minor disputes brought under § 152 First. *See Bhd. of Maint. of Way Emps. v. CSX Transp., Inc.*, 143 F. App'x 155, 160 (11th Cir. 2005) (holding that a district court may not "assert jurisdiction to hear and decide claims under § 2 First" if those claims "give rise to a minor dispute"); *see also Am. Train Dispatchers Ass'n v. Nat'l Ry. Lab. Conf.*, 525 F. Supp. 3d 107, 120 (D.D.C. 2021) (holding that, because the dispute was minor, "any remaining claim under Section 2, First also cannot survive"); *Bhd. of Maint. of Way Emps. v. Union Pac. R.R. Co.*, 358 F.3d 453, 457 (7th Cir. 2004) (holding that, because the dispute was minor, "the district court was divested of jurisdiction over [the union's] claim for a declaration that [the railway] violated Section 2 First of the RLA").

*First*, PAFCA never argues that it has met this exception. So, it's forfeited any such argument. *See, e.g.*, *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc) (holding that the "failure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances"); *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("In the first place, the law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

*Second*, PAFCA cannot show that an injunction is necessary to preserve the adjustment board's jurisdiction because (for whatever reason) it hasn't invoked the board's jurisdiction in the first place. Since "[t]he purpose of issuing an injunction in a minor dispute is to preserve the jurisdiction of the Adjustment Board[,] [i]f a minor dispute is not pending before the Adjustment Board, the District Court has no power to grant injunctive relief." *Westchester Lodge 2186, Bhd. of Ry. & S. S. Clerks v. Ry. Exp. Agency, Inc.*, 329 F.2d 748, 753 (2d Cir. 1964). In our case, PAFCA has failed to allege that it submitted this dispute to arbitration. In fact, its position is that this case is a major dispute not subject to arbitration. As a result, we have no power to grant the injunctive relief PAFCA seeks. *See, e.g.*, *Manion v. Kansas City Terminal Ry. Co.*, 353 U.S. 927, 927 (1957) (vacating an injunction in a minor dispute "because the dispute [was] not pending before the . . . Adjustment Board"); *Ry. Lab. Execs.' Ass'n v. Metro-N. Commuter R.R. Co.*, 759 F. Supp. 1019, 1023 (S.D.N.Y. 1990) ("[T]he court has no power to grant injunctive relief in a minor dispute unless the dispute is actually pending before an adjustment board.").

*Third*, even if none of this were true, PAFCA's request for injunctive relief would still fail because PAFCA hasn't adequately alleged that a disruption to the status quo would render arbitration

meaningless. PAFCA avers only that "PAFCA and its members will be irreparably harmed if Defendant modifies unilaterally the terms and conditions of employment of the members." Am. Compl. ¶ 39. But it never explains *why* it would suffer irreparable harm or even *what* that irreparable harm might be. And, when it comes to this "extremely narrow" form of relief, it's not enough for PAFCA to simply parrot the legal standard. *See, e.g.*, *Lawrence v. United States*, 597 F. App'x 599, 602 (11th Cir. 2015) ("When reviewing a ruling on a facial jurisdictional attack, as in this case, we accept the well-pleaded factual allegations in the complaint as true. However, we are not required to accept mere conclusory allegations as true[.]" (cleaned up)).

*          *          *

For all these reasons, we have no power to issue an injunction in this minor dispute.[6]

## Conclusion

After careful review, we hereby **ORDER AND ADJUDGE** as follows:

1. Spirit's Motion to Dismiss [ECF No. 12] is **GRANTED**.

2. This case is **DISMISSED without prejudice**.[7]

3. The Clerk of Court shall **CLOSE** this case.

---

[6] With this, we do away with Count III of PAFCA's complaint—which seeks injunctive relief under 45 U.S.C. § 153. "[Section] 3 First of the RLA . . . provides for compulsory arbitration of minor disputes before the . . . Adjustment Board." *Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 449 (1987). We lack subject-matter jurisdiction over minor disputes under § 153. *See, e.g.*, *Chicago & Nw. Transp. Co. v. Ry. Lab. Execs.' Ass'n*, 855 F.2d 1277, 1286 (7th Cir. 1988) ("[W]e conclude that the district court correctly determined that because the present controversy is a minor dispute under the RLA, it is subject to the exclusive jurisdiction of the [adjustment board], and must be resolved under the Act's § 3 RLA procedures.").

[7] Although Spirit asked us to dismiss this case "with prejudice," *see* MSJ at 1, 10, 20, "[a] dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered without prejudice," *Stalley*, 524 F.3d at 1232. As a result, we dismiss a minor dispute under the RLA (over which we have no subject-matter jurisdiction) *without* prejudice, so that PAFCA may assert its claims in the proper forum.

4. All other pending motions are **DENIED** as moot, all other deadlines are **TERMINATED**, and any remaining hearings are **CANCELED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 25th day of March 2022.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record